**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION**

| | |
|---|---|
| TONI LAPORCHA ANDERSON<br><br>                              Plaintiff,<br><br>v.<br><br>EXPERIAN INFORMATION SOLUTIONS,<br>INC.; TRANSUNION, LLC; MAXIMUS<br>EDUCATION, LLC; and UNITED STATES<br>DEPARTMENT OF EDUCATION<br><br>                              Defendants. | Case No.:    8:26-cv-1873<br><br>**JURY TRIAL DEMANDED** |

**COMPLAINT**

Toni LaPorcha Anderson ("Plaintiff"), by and through her undersigned counsel, brings this Complaint against Defendants Experian Information Solutions, Inc. ("Experian"); TransUnion, LLC ("TransUnion"); Maximus Education, LLC, doing business as Aidvantage ("Aidvantage"); and the United States Department of Education (the "Department of Education") to recover actual, statutory, and punitive damages, costs, and attorneys' fees for Defendants' violations of the Fair Credit Reporting Act, 15 U.S.C. §§ 1681, *et seq.* (the "FCRA").

Plaintiff's damages arise out of (1) Experian and TransUnion's failures to follow reasonable procedures to assure the maximum possible accuracy of Plaintiff's credit reports in violation of the FCRA, 15 U.S.C. § 1681e(b); (2) Experian and TransUnion's repeated failure to conduct a reasonable reinvestigation in response to Plaintiff's disputes in violation of the FCRA, 15 U.S.C. § 1681i(a)(1)(A); and (3) Aidvantage and the Department of Education's repeated failure to investigate Plaintiff's indirect disputes, including their failure to review all relevant information

provided by Plaintiff in connection with her disputes, and to instruct Experian and TransUnion to modify, delete, or permanently block inaccurate credit account information on Plaintiff's credit report in violation of the FCRA, 15 U.S.C. § 1681s-2(b)(1). As a result of Defendants' failures to meet their statutory obligations, Plaintiff's creditworthiness was significantly impaired, and Plaintiff suffered harm.

The Complaint's allegations are based on Plaintiff's knowledge as to herself and, as to all other matters, the investigation of counsel. Counsel's investigation included review and analysis of, among other things, (1) judicial records; (2) legislative reports; (3) regulatory filings, investigations, and reports; (4) Defendants' press releases, media statements, and marketing presentations; and (5) academic publications and investigations by news outlets.

**PRELIMINARY STATEMENT**

1.    "Credit is the lifeblood of the modern American economy, and for the American consumer access to credit has become inextricably tied to consumer credit scores as reported by credit reporting agencies." *Burke v. Experian Info. Solutions, Inc.*, 2011 WL 1085874, at *1 (E.D. Va. Mar. 18, 2011). Accordingly, Congress passed the FCRA in 1970 "to ensure fair and accurate credit reporting, promote efficiency in the banking system, and protect consumer privacy." *Safeco Ins. Co. of Amer. v. Burr*, 551 U.S. 47, 52 (2007). Recognizing their "vital role in assembling and evaluating consumer credit and other information on consumers," 15 U.S.C. § 1681(a)(3), Congress placed substantial obligations on consumer reporting agencies ("CRAs"), like Defendants Experian and TransUnion, in order "to insure that [they] exercise their grave responsibilities with fairness, impartiality, and a respect for the consumer's right to privacy." 15 U.S.C. § 1681(a)(4).

2.    Of particular concern here, the FCRA required Experian and TransUnion to "follow reasonable procedures to assure [the] maximum possible accuracy" of Plaintiff's credit report. 15

U.S.C. § 1681e(b).  The FCRA further required Experian and TransUnion to conduct a "reasonable reinvestigation" in response to Plaintiff's numerous disputes.  15 U.S.C. § 1681i(a)(1)(A).

3.     Recognizing the vital role of furnishers in preparing and maintaining accurate consumer reports, Congress amended the FCRA in 1996 to impose substantive obligations on the businesses providing sensitive consumer information to consumer reporting agencies.  These furnishers of consumer information include banks, credit unions, automobile dealers, student loan providers, public information vendors, and a host of others.  The federal government is among the most significant furnishers of consumer information in the modern economy.

4.     These furnishers not only originate the information contained in consumer reports; they also electronically update the accounts (referred to within the industry as "tradelines") to reflect new information such as recent payments, past-due balances, delinquencies, and defaults. In other words, they play a vital part in not only the original preparation of a consumer report, but also the highly iterative process to maintain the accuracy of those reports over time.  Accordingly, the FCRA as amended obligates furnishers to conduct an investigation in response to consumer disputes and take steps to correct any mistake.  15 U.S.C. § 1681s-2(b)(1).

5.     Defendants Experian, TransUnion, Aidvantage, and the Department of Education, however, falsely reported that a student loan belonging to Plaintiff but discharged by the Department of Education in January 2025 remained in repayment, had an approximately $11,000 balance, and was 120-180-days past due.  Defendants Experian, TransUnion, Aidvantage, and the Department of Education persisted in publishing these false representations to Plaintiff's prospective employers and creditors in spite of her numerous disputes and supporting documentation establishing their reporting was inaccurate.  For nearly a year, Defendants' false

representations dragged Plaintiff's credit score to the low 500s—labeled by the Consumer Financial Protection Bureau as "deep subprime."

6. Accordingly, Plaintiff brings claims against Experian and TransUnion for failing to follow reasonable procedures to assure the maximum possible accuracy of Plaintiff's credit reports in violation of 15 U.S.C. § 1681e(b), and for repeatedly failing to conduct a reasonable reinvestigation in response to Plaintiff's numerous disputes in violation of 15 U.S.C. § 1681i.

7. Plaintiff also brings claims against Aidvantage and the Department of Education for failing to reasonably investigate Plaintiff's numerous disputes, including failing to review or entirely disregarding all relevant information provided by Experian and TransUnion in association with Plaintiff's disputes, in violation of 15 U.S.C. § 1681s-2(b).

8. Plaintiff seeks to recover actual, statutory, and punitive damages together with costs and reasonable attorneys' fees incurred in the prosecution of this action from Defendants for their willful and/or negligent violations of the FCRA.

## **PARTIES**

9. Plaintiff Toni LaPorcha Anderson is a natural person residing in Tampa, Florida. Plaintiff is a "consumer" as that term is defined in 15 U.S.C. § 1681a(c).

10. Defendant Experian Information Solutions, Inc. ("Experian") is a corporation with its principal place of business located at 475 Anton Blvd., Costa Mesa, CA 92626.  Experian is authorized to do business in the state of Florida, including in this District.  Experian regularly engages in the business of assembling, evaluating, and disseminating information concerning consumers for the purpose of furnishing "consumer reports" as that term is defined in 15 U.S.C. § 1681a(d) to third parties.  Accordingly, Experian is a "consumer reporting agency" as that term is defined in 15 U.S.C. § 1681a(f).

11.      Defendant TransUnion, LLC ("TransUnion") is a limited liability company with its principal place of business located at 555 West Adams Street, Chicago, IL 60661.  TransUnion is authorized to do business in the state of Florida, including in this District.  TransUnion regularly engages in the business of assembling, evaluating, and disseminating information concerning consumers for the purpose of furnishing "consumer reports" as that term is defined in 15 U.S.C. § 1681a(d) to third parties.  Accordingly, TransUnion is a "consumer reporting agency" as that term is defined in 15 U.S.C. § 1681a(f).

12.      Defendant Maximus Education, LLC, doing business as "Aidvantage" ("Aidvantage"), is a limited liability company with its principal place of business located at 1600 Tysons Blvd., Suite 1400, McLean, VA 22102.  Aidvantage is authorized to do business in the state of Florida, including in this District.  Aidvantage services federal student loans for the United States Department of Education and, in that role, regularly furnishes information concerning consumers to consumer reporting agencies, including Experian and TransUnion.  According to its website, "Aidvantage reports each student loan individually to consumer reporting agencies … every month at the end of the month."  Among other things, Aidvantage reports the total number of loans held by the consumer; the total debt represented by those loans; and each loan's payment history, including whether borrowers made timely payments and whether loans are delinquent or in default.  Accordingly, Aidvantage is a "furnisher" of consumer information as that term is defined at 15 U.S.C. § 1681s-2(b).

13.      Defendant United States Department of Education (the "Department of Education") is a cabinet-level executive agency of the federal government headquartered at 400 Maryland Avenue, Southwest, Washington, D.C. 20202.  The Department of Education originates and funds federal student loans made to borrowers by the federal government.  The Department of Education

then assigns these loans to loan servicers, who act as an intermediate customer service provider interfacing with borrowers. The Department of Education reports information on consumers to consumer reporting agencies, including Experian and TransUnion. Accordingly, the Department of Education is a "furnisher" of consumer information as that term is defined at 15 U.S.C. § 1681s-2(b).

## JURISDICTION AND VENUE

14. This Court has subject-matter jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. § 1331 and 15 U.S.C. § 1681p, which allow claims under the FCRA to be brought in any appropriate court of competent jurisdiction.

15. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this district.

## FACTUAL ALLEGATIONS

### I.   DEFENDANTS' STATUTORY OBLIGATIONS UNDER THE FCRA

#### A.   Congress Passed the FCRA in 1970 to Protect Consumers Like Plaintiff

16. In 1970, Congress found that "[a]n elaborate mechanism [had] been developed for investigating and evaluating the credit worthiness, credit standing, credit capacity, character, and general reputations of consumers." 15 U.S.C. § 1681(a)(2). This mechanism was the "consumer report." The FCRA defines a consumer report as "any written, oral, or other communication of any information by a consumer reporting agency bearing on a consumer's credit worthiness, credit standing, credit capacity, character, general reputation, personal characteristics, or mode of living which is used or expected to be used or collected in whole or in part for the purpose of serving as a factor in establishing the consumer's eligibility for" a vast array of basic goods, services, and components of economic life, including housing, employment, insurance, and credit. 15 U.S.C. § 1681a(d)(1).

17.     These consumer reports are prepared by "consumer reporting agencies," defined above as "CRAs."  The FCRA defines a CRA as "any person which, for monetary fees … regularly engages in whole or in part in the practice of assembling or evaluating consumer credit information or other information on consumers for the purpose of furnishing consumer reports to third parties." 15 U.S.C. § 1681a(f).  Today, the three major national CRAs are TransUnion, LLC; Experian Information Solutions, Inc.; and Equifax Information Services LLC.

18.     Congress determined that, in predicating their business on the preparation of these reports, Experian and TransUnion "assumed a vital role in assembling and evaluating consumer credit and other information on consumers."  15 U.S.C. § 1681(a)(3).  Congress explained Experian and TransUnion's central role in the economy in the statutory text:

> The banking system is dependent upon fair and accurate credit reporting. Inaccurate credit reports directly impair the efficiency of the banking system, and unfair credit reporting methods undermine the public confidence which is essential to the continued functioning of the banking system.

15 U.S.C. § 1681(a)(1).  Consequently, Congress found that "[t]here is a need to ensure that consumer reporting agencies [like Experian and TransUnion] exercise their grave responsibilities with fairness, impartiality, and a respect for the consumer's right to privacy."  15 U.S.C. § 1681(a)(4).

19.     As a result of these findings and conclusions, Congress enacted the FCRA in order

> to require that consumer reporting agencies [*i.e.*, Defendants Experian and TransUnion] adopt reasonable procedures for meeting the needs of commerce for consumer credit, personnel, insurance, and other information in a manner which is fair and equitable to the consumer, with regard to the confidentiality, accuracy, relevancy, and proper utilization of such information.

15 U.S.C. § 1681(b).  The preservation of a consumer's good name and reputation was of particular concern to Congress when it enacted the FCRA:

> [W]ith the trend toward computerization of billings and the establishment of all sorts of computerized data banks, the individual is in great danger of having his life

and character reduced to impersonal "blips" and key-punch holes in a stolid and unthinking machine which can literally ruin his reputation without cause, and make him unemployable or uninsurable, as well as deny him the opportunity to obtain a mortgage to buy a home. ***We are not nearly as much concerned over the possible mistaken turn-down of a consumer for a luxury item as we are over the possible destruction of his good name without his knowledge and without reason.***

*… [A]s Shakespeare said, the loss of one's good name is beyond price and makes one poor indeed.*

*Bryant v. TRW, Inc.*, 689 F.2d 72, 79 (6th Cir. 1982) (quoting 116 Cong. Rec. 36570 (1970)) (emphasis added).

20.    In sum, "[t]he FCRA evinces Congress's intent that consumer reporting agencies, having the opportunity to reap profits through the collection and dissemination of credit information, bear 'grave responsibilities' … to ensure the accuracy of that information." *Cushman v. Trans Union Corp.*, 115 F.3d 220, 225 (3d Cir. 1997) (quoting 15 U.S.C. § 1681(a)(4)). As alleged below, since the FCRA's passage into law, Defendants Experian and TransUnion have consistently failed to uphold those responsibilities, including in the preparation of Plaintiff's credit files and reports.

**B.    The FCRA Imposed Substantive Obligations on Defendants Experian and TransUnion**

21.    As alleged above, in light of their central role in the preparation and dissemination of consumer information, Congress imposed "grave responsibilities" on Defendants Experian and TransUnion. 15 U.S.C. § 1681(a)(4). Relevant here, the FCRA requires that "[w]henever a consumer reporting agency prepares a consumer report it shall follow reasonable procedures ***to assure maximum possible accuracy*** of the information concerning the individual about whom the report relates." 15 U.S.C. § 1681e(b) (emphasis added).

22.    The FCRA requires further that Defendants Experian and TransUnion reinvestigate when consumers dispute inaccurate information on their credit report:

> [I]f the completeness or accuracy of any item of information contained in a consumer's file at a consumer reporting agency is disputed by the consumer and the consumer notifies the agency directly, or indirectly through a reseller, of such dispute, the agency shall, free of charge, conduct a reasonable reinvestigation to determine whether the disputed information is inaccurate and record the current status of the disputed information, or delete the item from the file …, before the end of the 30-day period beginning on the date on which the agency receives the notice of the dispute from the consumer or reseller.

15 U.S.C. § 1681i(a)(1)(A).  As the statutory text makes clear, Defendants Experian and TransUnion generally must complete the reinvestigation within thirty days of receiving the consumer's dispute.  The reinvestigation "may be extended for not more than 15 additional days," but only if "the consumer reporting agency receives information from the consumer" during the original thirty-day period "that is relevant to the reinvestigation."  15 U.S.C. § 1681i(a)(1)(B).

23.     If, after the reinvestigation "an item of the information [disputed by the consumer] is found to be inaccurate or incomplete or cannot be verified," Experian and TransUnion must take both of the following steps:

> (i) promptly delete that item of information from the file of the consumer, or modify that item of information, as appropriate, based on the results of the reinvestigation; and

> (ii) promptly notify the furnisher of that information that the information has been modified or deleted from the file of the consumer.

15 U.S.C. § 1681i(a)(5)(A).  In other words, Experian and TransUnion must either verify the information or delete it from the consumer's file.

24.     Thus, for the last five decades, federal law has required Experian and TransUnion to implement and utilize reasonable procedures "to assure maximum possible accuracy" of the personal, private, and financial information on individual consumers that they collect, compile, and sell, including Plaintiff's. It has further required Experian and TransUnion to conduct a reasonable reinvestigation in response to consumer disputes, after which they must verify the

information as accurate or delete it from the consumer's file.  As alleged below, however, Experian and TransUnion willfully—or, at a minimum, negligently—failed to meet this statutory obligation.

**C.    Congress Amended the FCRA in 1996 and Then Again in 2003 to Place Substantive Obligations on "Furnishers"**

25.    Experian, TransUnion, and Equifax maintain credit files on more than 200 million consumers.  The credit bureaus use a largely, if not entirely, electronic process to compile the ocean of sensitive consumer information necessary for such an undertaking.  Specifically, Experian, TransUnion, and Equifax receive, sort, and store information gathered by "furnishers."  These furnishers report consumer information to the bureaus through coded tapes transmitted on a monthly basis via software known as Metro 2.  Experian, TransUnion, and Equifax then take the consumer information reported by furnishers and compile it into consumer reports.

26.    The furnishers of consumer information include various and diverse sources throughout the national economy, including banks, credit unions, automobile dealers, student loan providers, public information vendors, and a host of others.  Of particular note here, the federal government is among the most significant furnishers of consumer information in the modern economy.  In fact, in 2024, the Supreme Court found that "federal agencies are among 'the largest furnishers of credit information' to consumer reporting agencies." *Dep't of Agriculture Rural Dev. Rural Housing Serv. v. Kirtz*, 601 U.S. 42, 48 (2024) (quoting *Robinson v. Dep't of Ed.*, 590 U.S. 914, 917 (2020) (Thomas, J., dissenting from denial of certiorari)).  Based in part on this finding, in *Kirtz*, the Supreme Court held that Congress waived sovereign immunity for federal agencies sued under the FCRA.  *Dep't of Agriculture Rural Dev. Rural Housing Serv. v. Kirtz*, 601 U.S. 42, 51-52 (2024).

27.    Recognizing that furnishers play a critical role in the preparation of accurate consumer reports, Congress passed the Consumer Credit Reporting Reform Act in 1996.

Furnishers not only originate the information contained in consumer reports; they also electronically update the accounts (referred to within the industry as "tradelines") to reflect new information such as recent payments, past-due balances, delinquencies, and defaults.  In other words, they play a vital part in not only the original preparation of a consumer report, but also the highly iterative process to maintain the accuracy of those reports over time.

28.    Accordingly, the FCRA as amended obligated furnishers to conduct an investigation in response to consumer disputes and take steps to correct any mistake.  15 U.S.C. § 1681s-2(b)(1); *Dep't of Agriculture Rural Dev. Rural Housing Serv. v. Kirtz*, 601 U.S. 42, 46-47 (2024).  Congress leaned on lawsuits by private litigants to effectuate its intent.  As the Supreme Court put it in *Kirtz*:

> To enforce these provisions, Congress revised the 1970 Act's remedial provisions. Where it had once authorized consumer suits against only consumer reporting agencies and users of their information, Congress now authorized consumer suits against "[a]ny person" who willfully or negligently fails to comply with "any" of the law's "requirement[s]."

*Dep't of Agriculture Rural Dev. Rural Housing Serv. v. Kirtz*, 601 U.S. 42, 47 (2024) (quoting 15 U.S.C. §§ 1681n(a), 1681o(a)).

29.    Thus, for the last three decades, federal law has required Aidvantage and the Department of Education to investigate the information they furnished in response to a consumer's dispute.  It has further imposed liability on furnishers, including governmental entities, when they failed to meet this obligation.  As alleged below, however, Aidvantage and the Department of Education willfully—or, at a minimum, negligently—failed to meet this statutory obligation.

II.    **DEFENDANTS' FALSE REPRESENTATIONS CONCERNING PLAINTIFF'S DISCHARGED STUDENT LOAN HARMED PLAINTIFF'S CREDIT STANDING AND ABILITY TO OBTAIN EMPLOYMENT**

A.    **Plaintiff Took Out Student Loans to Attend School That Were Ultimately Discharged Due to the Institution's Misconduct**

1.   **From 2007 to 2008, Plaintiff Took Out Federal Student Loans to Attend the Now-Defunct Miami International University of Art & Design**

30.   Beginning in 2007, Plaintiff attended the Miami International University of Art & Design, a member of the Art Institutes system of schools.  According to an October 2, 2023 report by the *Miami Herald*, the Art Institutes "consisted of a private, for-profit system of art schools, offering programs at the certificate, associate, bachelor, and master's levels." "A 2021 document on the Miami university's website" reported on by the *Miami Herald*, "list[ed] the approximate total cost for a bachelor's degree at $103,500 over 12 quarters."

31.   Plaintiff took out federal student loans in order to afford the substantial cost of tuition.  Table 1 below lists the servicer, loan date, loan type, interest rate, and repayment plan for each of Plaintiff's federal student loans taken out from 2007 to 2008 according to her My Aid tool in her Federal Student Aid online dashboard as of October 6, 2025:

| Table 1:  Plaintiff's Original Federal Student Loans | | | | |
|---|---|---|---|---|
| **Servicer** | **Date** | **Type** | **Interest** | **Repayment Plan** |
| Debt Management and Collections System | 12/08/2008 | Unsubsidized | 6.80% | Standard |
| | 10/31/2008 | Subsidized | 6.00% | Standard |
| Higher Education Loan Authority of Missouri | 10/31/2008 | Unsubsidized | 6.80% | N/A |
| | 03/11/2008 | Subsidized | 6.80% | N/A |
| | 07/13/2007 | Subsidized | 6.80% | N/A |

32.   In or about September 2013, Plaintiff consolidated the two subsidized loans serviced by the Higher Education Loan Authority of Missouri listed in Table 1 above.  As of October 6, 2025, the consolidated loan was serviced by Defendant Aidvantage.  Table 2 below lists the servicer, loan date, loan type, interest rate, and repayment plan for each of Plaintiff's loans as of September 2013:

| Table 2:  Plaintiff's Federal Student Loans as of September 2013 | | | | |
|---|---|---|---|---|
| **Servicer** | **Date** | **Type** | **Interest** | **Repayment Plan** |
| Aidvantage | 09/09/2013 | Consolidation | 6.88% | Standard |
| | 12/08/2008 | Unsubsidized | 6.80% | Standard |

| Debt Management and Collections System | 10/31/2008 | Subsidized | 6.00% | Standard |
|---|---|---|---|---|
| Higher Education Loan Authority of Missouri | 10/31/2008 | Unsubsidized | 6.80% | N/A |

**2.      In January 2025, the Department of Education Discharged Plaintiff's Student Loans**

**a.      The Department of Education Uncovered the Miami International University of Art & Design's Years-Long Fraud**

33.      Unbeknownst to Plaintiff, the Miami International University of Art & Design—along with the rest of the Art Institute system—had a long history of defrauding its students. According to a May 1, 2024 report by the *Associated Press*, that history culminated in a Department of Education investigation, which uncovered that "[t]he chain told prospective students that more than 80% of graduates found jobs in their fields of study," a number "largely based on doctored data" with "[t]he true employment rate … below 57%." The Department of Education found further that "campuses … advertised graduate salaries that were based on fabricated data and included extreme outliers to make averages look better."

34.      As a result, the Department of Education discharged loans for students who attended schools in the Art Institute system between January 1, 2004 and October 16, 2017, including the Miami International University of Art & Design. Commenting on the decision, then-chief operating officer of the agency's Federal Student Aid Office, Richard Cordray, stated: "'[t]he Art Institutes preyed on the hopes of students attempting to better their lives through education…. We cannot replace the time stolen from these students, but we can lift the burden of their debt.'" Putting it even more succinctly, then-President Biden stated that the Art Institute "falsified data, knowingly misled students, and cheated borrowers into taking on mountains of debt without leading to promising career prospects at the end of their studies.'"

**b.** **The Department of Education Confirmed Plaintiff's Student Loan Discharge in January 2025**

35. Accordingly, on January 8, 2025, Plaintiff received an email from the Department of Education with the subject line "Confirming your student loan discharge." The Department of Education's email informed Plaintiff that the Department of Education had made a prior determination that Plaintiff's federal student loans should be discharged based on misconduct by the school she attended, stating the following:

> [T]he federal student loans you received to attend the Art Institutes during the period of January 1, 2004 through October 16, 2017 would be discharged because ED [*i.e.*, the Department of Education] concluded that your school made pervasive and widespread substantial misrepresentations which borrowers relied on to their detriment, and/or violated state consumer protection laws.

The Department of Education's email further "confirm[ed] that if your discharge is still incomplete **you do not have to make any more payments on the loan(s)** that we are in the process of discharging" and the Department of Education would "discharge the **full remaining balance** of your eligible loans and refund all payments you previously made to ED on these loans." (emphasis in original). According to the Department of Education, this determination included "any Federal consolidation loan(s) that repaid those eligible loans"—*i.e.*, including Plaintiff's consolidated federal student loan serviced by Aidvantage (the "Discharged Student Loan").

36. As a practical matter, the Department of Education reported that its determination meant that Plaintiff's student loans "are not enforceable," and Plaintiff was "no longer obligated to repay them." In fact, the Department of Education's email repeatedly emphasized that it would "not seek to enforce" Plaintiff's student loans—even stating that "*any future attempts to collect on or enforce [her] repayment obligations are without legal basis*." (emphasis added). Accordingly, the Department of Education confirmed it would "[r]emove the loans from [Plaintiff's] credit report if they are fully discharged."

          c.        **Except for the Loan Serviced by Aidvantage, all of Plaintiff's Student Loans were Promptly Removed from her Credit Report**

37.     Plaintiff's loan servicers were notified of the Department of Education's determination regarding her now-discharged student loans. Specifically, the Department of Education's email informed Plaintiff that her "servicer has been instructed that the loan(s) that is(are) the subject of this notice should not be put into repayment." Accordingly, almost all of Plaintiff's then-current loan servicers reported that Plaintiff's federal student loans were discharged or cancelled. Table 3 below lists the statuses for Plaintiff's student loans according to the My Aid tool in her Federal Student Aid online dashboard as of October 6, 2025:

**[THIS SPACE INTENTIONALLY LEFT BLANK]**

| Table 3: Plaintiff's Federal Student Loans as of October 6, 2025 | | | | | |
|---|---|---|---|---|---|
| **Servicer** | **Date** | **Type** | **Interest** | **Repayment Plan** | **Status** |
| Aidvantage | 09/09/2013 | Consolidation | 6.88% | Standard | In Repayment |
| Debt Management and Collections System | 12/08/2008 | Unsubsidized | 6.80% | Standard | Discharged |
| | 10/31/2008 | Subsidized | 6.00% | Standard | Discharged |
| Higher Education Loan Authority of Missouri | 10/31/2008 | Unsubsidized | 6.80% | N/A | Cancelled |
| | 03/11/2008 | Subsidized | 6.80% | N/A | Paid-in-Full by Consolidation[1] |
| | 07/13/2007 | Subsidized | 6.80% | N/A | Paid-in-Full by Consolidation[2] |

Thus, as of October 6, 2025, Aidvantage was the only loan servicer continuing to inaccurately represent that Plaintiff's federal student loans to attend the now defunct Miami International University of Art & Design remained in repayment.

---

[1] As alleged above, Plaintiff's two subsidized loans previously serviced by the Higher Education Loan Authority of Missouri were consolidated into the single loan serviced by Aidvantage identified in the first row of Table 3.
[2] *See supra* n. 1.

- 15 -

38.     Aidvantage knew or should have known that it was falsely reporting the status of the Discharged Student Loan.  As alleged above, the Department of Education's January 8, 2025, email confirmed that Plaintiff's loan servicers were informed of the agency's determination.  Moreover, every loan servicer other than Aidvantage promptly updated their reporting to reflect the Department of Education's determination, indicating that the Department of Education in fact notified Plaintiff's loan servicers.  More tellingly, as alleged in greater detail below, Aidvantage informed Plaintiff by letter dated October 27, 2025, that "[t]he U.S. Department of Education (ED) recently determined that [her] loans to attend Arts Institute will be discharged."

**B.     Defendants' Failure to Update Plaintiff's Credit Report to Reflect the True Status of the Discharged Student Loan Precluded Plaintiff from Obtaining Vehicle Financing**

**1.     In February 2025, Plaintiff's Application for Credit to Fund a Family Vehicle Purchase was Denied**

39.     In or about February 2025, Plaintiff and her fiancé sought a joint auto loan to fund the purchase of a family vehicle.  On February 4, 2025, Ally Financial; Capital One Auto Financing; Santander Consumer USA; Suncoast Credit Union; and Capital One, N.A. ran a credit inquiry on Plaintiff.  After reviewing Plaintiff's credit reports, each lender denied Plaintiff's application for credit.  As a result, Plaintiff's fiancé was forced to independently apply for an auto loan to fund the purchase of a 2018 Nissan Moreno, which he ultimately obtained.

**2.     Experian and TransUnion's False Representations Concerning the Discharged Student Loan Were a Substantial Factor in Plaintiff's Credit Denials**

40.     Defendants' false representations concerning the Discharged Student Loan were the only derogatory credit tradeline on Plaintiff's credit reports at that time.  Experian's September 3, 2025, credit report and TransUnion's September 3, 2025, excerpted credit report falsely represented that Plaintiff owed $11,690 on the Discharged Student Loan despite the Department

of Education's January 8, 2025, confirmation that the loan was discharged.  According to that same credit report from Experian and a full report generated by TransUnion on September 29, 2025, this was Plaintiff's only purported debt obligation.  In fact, the remaining accounts were unanimously marked as reflecting "Exceptional payment history" and their status was reported as "Paid, Closed/Never late."   Thus, Defendants Experian and TransUnion's false representations concerning the Discharged Student Loan was the only derogatory credit tradeline on Plaintiff's credit reports and the only indication that she purportedly owed any money to anyone.

41.     Defendants Experian and TransUnion's false representations concerning the Discharged Student Loan negatively impacted Plaintiff's debt-to-income and debt-to-credit ratios—making it appear that she was a greater credit risk than she actually was.

42.     *First*, Defendants Experian and TransUnion's false representations negatively impacted Plaintiff's debt-to-income ratio.  A consumer's ratio of debt to income is a critical factor in assessing their creditworthiness.  In a November 1, 2024, publication on its website, Experian reported that:

> Your debt-to-income ratio (DTI) is an important measurement of your financial health.  Alongside your credit score, your DTI plays a big part in determining whether or not you're likely to qualify for a new loan, such as a mortgage….

> A high DTI signals to lenders that you have significant debt payments and that you may struggle to afford your monthly payments.  On the other hand, a low DTI can be a sign—both to you and to potential lenders—that you're on firm financial ground and are in a good position to consider a new loan.

Thus, Defendants Experian and TransUnion's false claim that Plaintiff still owed approximately $11,000 on the Discharged Student Loan negatively impacted her debt-to-income ratio, falsely, in Experian's words, "signal[ing] to lenders that [Plaintiff] [had] significant debt payments and … may struggle to afford [her] monthly payments."

43.     *Second*, Defendants Experian and TransUnion's false representations negatively impacted Plaintiff's debt-to-credit ratio.  Like the debt-to-income ratio, a particular consumer's ratio of credit to debt is a critical factor used to assess their creditworthiness.  Indeed, in a February 20, 2023, publication on its website, Experian reported that:

> How much you owe on your debt accounts, including loans and credit cards, makes up 30% of your FICO Score, and your debt-to-credit ratio is an influential factor in that category.  As a result, carrying high balances on your credit cards can have a significant negative impact on your credit score.

Defendants Experian and TransUnion's false claim that Plaintiff still owed approximately $11,000 on the Discharged Student Loan thus drove down, in Experian's words, "an influential factor" in determining her eligibility for credit.

44.     Thus, Defendants Experian and TransUnion's failure to accurately report the current status of the Discharged Student Loan was a substantial factor causing the denial of her applications for credit.

### 3.     Experian and TransUnion Failed to Follow Reasonable Procedures to Assure the Maximum Possible Accuracy of Plaintiff's Credit Files and Reports

45.     Experian and TransUnion's false representations concerning Plaintiff's credit standing were the result of their failures to follow reasonable procedures to assure the maximum possible accuracy of Plaintiff's consumer report in violation of 15 U.S.C. § 1681e(b).  As alleged above, the Department of Education confirmed it was discharging Plaintiff's student loans on January 8, 2025.  In that same notice, the Department of Education's notice further confirmed that it would "[r]emove the loans from [Plaintiff's] credit report"—nearly a month before Ally Financial; Capital One Auto Financing; Santander Consumer USA; Suncoast Credit Union; and Capital One, N.A. checked her credit reports.  Despite the Department of Education's apparent attempts to do so, however, Experian and TransUnion continued to falsely report that Plaintiff

owed approximately $11,000 on the now-discharged student loan. In failing to update Plaintiff's credit report to reflect the Department of Education's determination, Experian and TransUnion failed to follow reasonable procedures to assure the maximum possible accuracy of Plaintiff's credit report.

**4.    Defendants Experian and TransUnion's False Representations Caused Significant Harm to Plaintiff**

46.    Plaintiff suffered a range of damages as a result of Experian and TransUnion's failures to accurately report the current status of the Discharged Student Loan, including lost opportunities, emotional distress, and reputational harm.

47.    *First*, Plaintiff lost the opportunity to obtain joint financing to fund her purchase of a vehicle, which likely would have resulted in more favorable loan terms. Instead, Plaintiff's fiancé was forced to independently apply for the financing on more onerous terms that will be borne by both Plaintiff and her fiancé over time.

48.    *Second*, Plaintiff suffered emotional distress as a result of Experian and TransUnion's false representations concerning the Discharged Student Loan. Specifically, Plaintiff was forced to experience the humiliation and embarrassment of being denied credit in front of her fiancé, as well as the stress, fear, and anxiety that Plaintiff would continue to be precluded from credit opportunities in the future. As alleged in greater detail below, Plaintiff was particularly concerned with her ability to qualify for financing to purchase a home in which she and her soon-to-be husband would start their new life and family. As a result, Plaintiff experienced the stress, fear, and anxiety that Experian and TransUnion's false reporting would disrupt her relationship at a critical stage.

49.    *Third*, Plaintiff suffered reputational harm as a result of Experian and TransUnion's false representations concerning the Discharged Student Loan. Plaintiff and her fiancé applied for

joint financing to fund the purchase of a family vehicle. When Plaintiff's application for credit was denied, she was forced to inform her fiancé that her credit precluded them from taking a significant step in their family life. Instead, Plaintiff was forced to rely on others to obtain financing that she would have been eligible had Experian and TransUnion followed reasonable procedures to assure the maximum possible accuracy of her credit reports. Experian and TransUnion's false representations concerning the Discharged Student Loan thus humiliated and embarrassed Plaintiff in front of her soon-to-be husband.

**C.    Defendants Disregarded Plaintiff's First Dispute and Continued to Report the Discharged Student Loan as Past Due**

50.    After being denied auto financing, Plaintiff contacted Defendant Aidvantage via phone in or about March or April of 2025. Aidvantage appeared to indicate that Plaintiff remained responsible for the Discharged Student Loan despite the Department of Education's January 8, 2025 notice that her federal student loans, including the consolidated loan serviced by Aidvantage, had been discharged and were now without legal basis and unenforceable.

51.    As alleged below, Plaintiff submitted numerous disputes concerning Defendants Experian and TransUnion's false reporting of the status of the Discharged Student Loan. Experian and TransUnion, however, blindly parroted Aidvantage and the Department of Education's false verification of the purported accuracy of the account status and balance until Aidvantage reversed its position nearly a year after the Department of Education's confirmation that Plaintiff's student loans were discharged.

**1.    In August 2025, Plaintiff Sent Her First Dispute to Equifax and Defendants Experian and TransUnion**

52.    By letter dated August 16, 2025, Plaintiff disputed Experian, TransUnion, and Equifax's false representations concerning the status of the Discharged Student Loan ("Plaintiff's First Dispute"). Plaintiff attached a photo of her driver's license, a photo of her social security

card, and a printed copy of the Department of Education's January 8, 2025 email to her dispute letter.  Plaintiff's First Dispute explained that "[o]n Jan 8th, 2025 [she] received an email from the Department of Education stating that a determination had been reached that some or all of my student loans should be discharged based on misconduct by the school I attended."  Plaintiff's First Dispute included key disclosures from the Department of Education's January 8, 2025 email, including the following:

- "ED states they will not seek to enforce [the federal student loans] and, any future attempts to collect on or enforce my repayment obligations are without legal basis";

- "ED's prior determination was that the loans are not enforceable and that I'm no longer obligated to repay them";

- "The email states that if my discharge is still incomplete then I do not have to make any more payments on the loans that they are in the process of discharging"; and

- "The email also states that until ED completes its work, my eligible loans will remain paused in forbearance or stopped collections, and I will not be asked to resume payments."

Concluding Plaintiff's First Dispute, she explained her nonpayment of the loan and the impact of each bureau's inaccurate reporting of the nonexistent obligation to prospective creditors.  Plaintiff stated, "[h]aving received this email, I elected to stop the payments and now my credit score has significantly decreased.  I am in the process of trying to purchase a home and this is negatively and severely impacting my progress."

  **2. Defendants Experian and TransUnion Failed to Conduct Reasonable Investigations in Response to Plaintiff's First Dispute While Equifax Promptly Corrected the Inaccuracy**

53. As alleged below, Experian, TransUnion, and Equifax received Plaintiff's First Dispute and Experian and TransUnion forwarded the dispute and its supporting documents to Aidvantage and the Department of Education.  After their "reinvestigations," Defendants Experian and TransUnion purportedly verified the current status of the Discharged Student Loan in spite of the Department of Education's January 8, 2025, determination that the loan had been discharged.

They did so based on Aidvantage and the Department of Education's false verification that the disputed information was being reported accurately.  Ultimately, only Equifax corrected the inaccuracy in Plaintiff's credit report in response to Plaintiff's First Dispute—confirming she had provided sufficient information to support her dispute of the inaccurate credit tradeline.

<strong>a.  Experian Failed to Conduct a Reasonable Reinvestigation in Response to Plaintiff's First Dispute</strong>

54. Rather than reinvestigate the Discharged Student Loan in response to Plaintiff's First Dispute, Experian blindly parroted Aidvantage and the Department of Education's false representations concerning Plaintiff's consolidated federal student loan.

55. On September 2, 2025, Experian generated correspondence claiming that its reinvestigation of Plaintiff's First Dispute was purportedly complete.  Experian provided absolutely no information from which Plaintiff could glean the results of its purported reinvestigation and stated that Plaintiff's "dispute results are not currently available online." Instead of results, Defendant Experian provided the following generic language:

> Our reinvestigation of the dispute you recently submitted is now complete.  If we were able to make changes to your credit report based on information you provided, we have done so.  Otherwise we have contacted the company reporting the information you disputed, supplied them all relevant information and any documents you gave use with your dispute, and instructed them to: review all information we provide them about your dispute; verify the accuracy of the information; provide us a response to your dispute; and update their records and systems as necessary.

The remainder of Defendant Experian's missive consisted of boilerplate notices and disclosures having little to nothing to do with the specifics of Plaintiff's First Dispute.

56. Experian's September 3, 2025, claim that its reinvestigation was complete was inferably false.  Instead, it failed to complete its reinvestigation in the thirty-day period provided by 15 U.S.C. § 1681i(a)(5)(A).  On September 23, 2025, apparently unprompted, Experian generated additional correspondence concerning Plaintiff's First Dispute—over thirty days after

Experian likely received Plaintiff's First Dispute, which was dated August 16, 2025. This correspondence contained the same generic language quoted above, but, this time, Defendant Experian informed Plaintiff of the actual results of its purported reinvestigation. The relevant portion of Experian's dispute results are reproduced in Figure 1 below:

*Figure 1:* *Experian's September 3, 2025 Verification of the Disputed Discharged Student Loan.*



These results were entirely absent from Experian's correspondence generated on September 3, 2025, indicating that, contrary to Experian's representations, its reinvestigation was not complete until September 23, 2025—over thirty days after Experian likely received Plaintiff's First Dispute.

57. Defendant Experian's false verification of the Discharged Student Loan meant that the disputed information remained in Plaintiff's credit report. Thus, Plaintiff's Experian credit report generated on September 29, 2025, falsely represented that the Discharged Student Loan was in repayment, had a $11,751 balance, and was 180-days past due. The relevant portion of Experian's September 29, 2025, credit report is reproduced in Figure 2 below:

*Figure 2:* *Experian's September 29, 2025, False Reporting of the Discharged Student Loan.*



58.    Experian's September 23, 2025, verification of the false status of the Discharged Student Loan is direct evidence that it failed to conduct a reasonable reinvestigation of Plaintiff's First Dispute in violation of 15 U.S.C. § 1681i(a)(1)(A). As alleged above, Plaintiff's First Dispute provided not only a detailed description of the Department of Education's determination to discharge her student loans but also attached the Department of Education's January 8, 2025, email

confirming that her loans had been discharged.  As alleged below, Equifax corrected Plaintiff's credit report based on Plaintiff's First Dispute alone.  Experian's failure to likewise correct Plaintiff's credit report thus demonstrates that it either failed to review the information provided in connection with Plaintiff's First Dispute, or disregarded it entirely.  Instead, Experian blindly parroted Aidvantage and the Department of Education's claim that the information concerning the Discharged Student Loan was correct as reported.  As a result, Plaintiff's consumer report falsely represented that the Discharged Student Loan was in repayment, had an approximately $11,000 balance, and was 180-days past due.

59.    In failing to remove the Discharged Student Loan from Plaintiff's credit report, Experian further violated 15 U.S.C. § 1681e(b).  The FCRA requires Experian to implement and utilize "reasonable procedures to assure [the] maximum possible accuracy" of Plaintiff's credit report.  15 U.S.C. § 1681e(b).  Experian, however, failed to review or disregarded the Department of Education's January 8, 2025, email, which was attached to Plaintiff's First Dispute.  This email informed Experian that the Discharged Student Loan was unenforceable, without legal basis, and should be removed from Plaintiff's credit report.  In failing to review or disregarding this record in its possession, Experian failed to follow reasonable procedures to assure the maximum possible accuracy of Plaintiff's credit report.

**b.    TransUnion Failed to Conduct a Reasonable Reinvestigation in Response to Plaintiff's First Dispute**

60.    Rather than reinvestigate the Discharged Student Loan, TransUnion—like Experian—blindly parroted Aidvantage and the Department of Education's false representations concerning Plaintiff's consolidated federal student loan.

61.    By letter dated September 3, 2025, TransUnion informed Plaintiff that its investigation of Plaintiff's First Dispute was purportedly complete and that it had verified the

disputed tradeline as accurate.  TransUnion's letter included a generic description of the actions

TransUnion may have taken to resolve Plaintiff's dispute without clearly identifying the specific

actions the bureau actually took to reach its determination.  The relevant portion of TransUnion's

dispute resolution letter is reproduced below:

> Our investigation of the dispute you submitted is now complete.  After a review of your dispute and any provided documentation, we took one or more of the following action(s):
>
> 1.  Updated your credit report based on the information you provided; OR
> 2.  Determined that the information you disputed either does not appear on your credit file or already shows the requested status; OR
> 3.  Determined that the data furnished had previously verified the reported information.  If any of the items you disputed were previously verified, a separate communication was sent to you listing those items along with the data furnisher's contact information; OR
> 4.  Asked the data furnisher reporting the information you disputed to do all of the following:
>       - Review relevant information we sent them, including any provided documents
>       - Investigate your dispute and verify whether the information they report is accurate
>       - Provide us a response to your dispute and update any other information
>       - Update their records and systems, if necessary.

As the above reproduction makes clear, TransUnion's description of its purported reinvestigation

was nothing more than a generic, boilerplate identification of all the steps the company *could have*

*taken* to resolve Plaintiff's dispute without any identification of the steps TransUnion *actually*

*took*.

62.     By process of elimination, TransUnion's letter indicated it had asked Aidvantage

and the Department of Education to investigate Plaintiff's First Dispute.  TransUnion's letter

specified that such a request included asking the furnishers to (1) "Review relevant information

[TransUnion] sent them, including any provided documents"; (2) "Investigate [Plaintiff's] dispute

and verify whether the information they report is accurate"; (3) "Provide [TransUnion] a response

to [Plaintiff's] dispute and update any other information"; and (4) Update their records and system, if necessary." Aidvantage and the Department of Education then falsely verified that the disputed information was accurate, and updated the status on the account to falsely represent that Plaintiff was 120 days past due on the Discharged Student Loan. TransUnion, in turn, parroted Aidvantage's verification inferably without conducting any independent reinvestigation.

63. TransUnion's false verification of the Discharged Student Loan meant that the disputed information remained in Plaintiff's credit report. Thus, Plaintiff's TransUnion credit report generated on September 29, 2025, falsely represented that the Discharged Student Loan was in repayment, had a $11,751 balance, and was 120-days past due. The relevant portion of TransUnion's September 29, 2025, credit report is reproduced in Figure 3 below:

**[THIS SPACE INTENTIONALLY LEFT BLANK]**

*Figure 3:* *TransUnion's September 29, 2025, False Reporting of the Discharged Student Loan.*



64.    TransUnion's erroneous verification of the Discharged Student Loan demonstrates that it failed to conduct a reasonable reinvestigation in violation of 15 U.S.C. § 1681i(a)(1)(A). As with Experian, Plaintiff's First Dispute to TransUnion provided not only a detailed description of the Department of Education's determination to discharge her student loans but also attached the Department of Education's January 8, 2025, email.  As alleged below, this was sufficient for Equifax to correct Plaintiff's credit report.  TransUnion's failure to likewise correct Plaintiff's credit report thus demonstrates that it—like Experian—either failed to review the information

- 28 -

provided in connection with Plaintiff's First Dispute or disregarded it entirely. Instead, TransUnion also blindly parroted Aidvantage and the Department of Education's claim that the information concerning the Discharged Student Loan was correct as reported. As a result, Plaintiff's consumer report falsely represented that the Discharged Student Loan was in repayment, had an over $11,000 balance, and was 120-days past due.

65. In failing to remove the Discharged Student Loan from Plaintiff's credit report, TransUnion further violated 15 U.S.C. § 1681e(b). The FCRA requires TransUnion, like Experian, to implement and utilize "reasonable procedures to assure [the] maximum possible accuracy" of Plaintiff's credit report. 15 U.S.C. § 1681e(b). TransUnion, however, failed to review or disregarded the Department of Education's January 8, 2025, email provided with Plaintiff's First Dispute. This email informed TransUnion that the Discharged Student Loan was unenforceable, without legal basis, and should be removed from Plaintiff's credit report. In failing to review or disregarding this record in its possession, TransUnion failed to follow reasonable procedures to assure the maximum possible accuracy of Plaintiff's credit report.

### c. Aidvantage and the Department of Education Failed to Conduct a Reasonable Investigation in Response to Plaintiff's First Dispute

66. As alleged above, both Experian and TransUnion's dispute results stated that they had forwarded Plaintiff's First Dispute and the supporting documentation to the furnisher—Aidvantage and the Department of Education. Both bureaus further confirmed that the furnisher—Aidvantage and the Department of Education—purportedly verified the disputed information as accurate. In doing so, Aidvantage and the Department of Education failed to conduct a reasonable investigation in violation of 15 U.S.C. § 1681s-2(b).

67. Aidvantage and the Department of Education's responses to Experian confirm that they failed to conduct a reasonable investigation of Plaintiff's First Dispute, as it was forwarded

by Experian. Experian's dispute results reproduced in Figure 1 above confirms that Aidvantage and the Department of Education received notice of Plaintiff's dispute, and Experian's report claims that Aidvantage and the Department of Education were provided "all relevant information and any documents" provided with Plaintiff's First Dispute. As alleged above, Plaintiff attached a photo of her Driver's license, a photo of her social security card, and a copy of the Department of Education's January 8, 2025 email. Despite the Department of Education's January 8, 2025, email confirming that Plaintiff's student loans had been discharged, were unenforceable, and were without legal basis, however, Aidvantage and the Department of Education verified their false reporting. They thereby claimed that the Discharged Student Loan was actually in repayment, had an over $11,000 balance, and was 180 days past due. Thus, Aidvantage and the Department of Education either failed to review or disregarded Plaintiff's First Dispute and the documents attached thereto. In doing so, they failed to conduct a reasonable investigation in violation of 15 U.S.C. § 1681s-2(b).

68. Defendant Aidvantage and the Department of Education's responses to TransUnion likewise confirms that they failed to conduct a reasonable investigation of Plaintiff's First Dispute, as it was forwarded by TransUnion. TransUnion's letter indicates that the furnisher—Aidvantage and the Department of Education—received notice of Plaintiff's First Dispute and the supporting documents attached by Plaintiff. Nevertheless, just as they did with Experian, Aidvantage and the Department of Education purportedly certified to TransUnion that the information it was actively (and falsely) reporting concerning the Discharged Student Loan was accurate. Aidvantage and the Department of Education, however, took it a step further and updated the tradeline's status to falsely reflect that Plaintiff was 120 days past due. Thus, Aidvantage and the Department of Education either failed to review or disregarded Plaintiff's First Dispute and the documents

attached thereto.  In doing so, they failed to conduct a reasonable investigation in violation of 15 U.S.C. § 1681s-2(b).

69.     Even if Experian and TransUnion failed to provide the Department of Education's January 8, 2025, email to Aidvantage and the Department of Education in connection with Plaintiff's First Dispute, each was already aware of the Department of Education's determination. The Department of Education was, to say the least, inferably aware of its own determination.  As to Aidvantage, the Department of Education's January 8, 2025, email stated that Plaintiff's loan "servicer has been instructed that the loan(s) that is(are) the subject of this notice should not be put into repayment."  And, as alleged in greater detail below, Defendant Aidvantage later confirmed this understanding via letter dated October 27, 2025.  Nevertheless, Aidvantage and the Department of Education certified to Experian and TransUnion that the information it was actively (and falsely) reporting concerning the Discharged Student Loan was accurate.  As a result, Plaintiff's credit score continued to plummet as she missed payments she did not owe on a loan that no longer existed.

> **d.      Unlike Experian and TransUnion, Equifax Quickly Corrected Plaintiff's Credit Report in Response to Plaintiff's First Dispute**

70.     On September 29, 2025, Equifax generated a corrected credit report for Plaintiff. That report reflected a $0.00 balance for the tradeline identified in Plaintiff's First Dispute, that the account was closed, and that Plaintiff paid the account as agreed.  As Plaintiff provided the same letter and attachments to all three national CRAs, Equifax's response demonstrates that Plaintiff had provided Experian and TransUnion with sufficient information to correct the inaccurate information in her credit reports.  Rather than conduct the "reasonable reinvestigation" required by 15 U.S.C. § 1681i(a)(1)(A), however, Experian and TransUnion obsequiously deferred

to Aidvantage and the Department of Education's false representations concerning the Discharged Student Loan.

**3.      Defendants' Failures to Meet Their Statutory Obligations Significantly Damaged Plaintiff's Credit Standing**

71.      According to Experian and TransUnion's September 29, 2025, credit reports excerpted above, Plaintiff's Fair Isaac Corporation ("FICO") score was 522 and 528, respectively. Accordingly, both bureaus reported that her credit standing was "Poor."  Indeed, the Consumer Financial Protection Bureau characterizes credit scores below 580 as "deep subprime," indicating a substantial likelihood that the borrower will default on their debt obligations.

72.      Defendants' failures to investigate and correct their false representations concerning the Discharged Student Loan were a substantial cause of Plaintiff's significantly impaired credit standing.  According to Experian's September 29, 2025, credit report, Plaintiff had purportedly missed two payments on the Discharged Student Loan and was 180 days past due as of August 2025.  TransUnion's September 29, 2025, credit report claimed that Plaintiff had purportedly missed 5 payments on the Discharged Student Loan and was 120 days past due as of August 2025.  There was, however, no other negative information on Plaintiff's credit report.  In fact, the remaining accounts were unanimously marked as reflecting "Exceptional payment history" and their status was reported as "Paid, Closed/Never late."  Thus, Defendants' refusal to correct the falsely reported Discharged Student Loan was a substantial cause of Plaintiff's purportedly poor credit.

**D.      Defendants' Refusal to Correct Plaintiff's Credit Report Precluded Her from Obtaining Employment**

73.      Defendants' refusal to correct Plaintiff's credit report in response to Plaintiff's First Dispute caused her to lose at least two jobs in September 2025. *First*, in or about September 2025, Plaintiff applied for a position as a Data Entry Clerk with Throgs Neck Physical Therapy

("Throgs").  Throgs indicated that Plaintiff was likely to obtain the position.  Specifically, on September 27, 2025, Throgs Hiring Manager, Brian Cogley, emailed Plaintiff the following message:

> We received your application for our **Data Entry** Clerk job position, and we feel your background would be a good match with our company.  We are in the middle of processing applications and currently have seven other applications along with yours that we are considering, ***so you can think of yourself on the shortlist to be hired***.

74.   Cogley went on to inform Plaintiff, however, that "our company requires all potential employees to have a credit score on file for your interview" because "you will have access to company credit cards for business expenses."   Thus, the company "request[ed] that each potential employee complet[es] [a credit check] as this ensures that our future employee is credible, trustworthy, and can be an asset to the company."   As alleged above, however, the Discharged Student Loan was a substantial drag on Plaintiff's otherwise glowing credit profile.  Ultimately, Throgs discontinued the employment process after the company reviewed her credit report.

75.   Defendants' failures to correct the falsely reported Discharged Student Loan were a substantial factor in Throgs' denial of Plaintiff's employment application.  Cogley's email informed Plaintiff that "because of the new economy we take into consideration that there may be some blemishes on a large portion of applicant scores."   Cogley explained further that "credit scores themselves aren't significant, but our company still requires the report." Defendants, however, were actively (and falsely) reporting that Plaintiff had missed two to five payments and was 120-to-180-days past due on the Discharged Student Loan.  Even the most generous reading of Plaintiff's credit report on Throgs' part could not overlook the deep subprime status to which this purportedly unpaid obligation dragged Plaintiff's credit score.

76.    *Second*, around the same time Plaintiff applied to Throgs, she also applied to work for State Farm.  Like Throgs, State Farm reviewed Plaintiff's credit profile.  On September 29, 2025, after pulling Plaintiff's credit report, State Farm Agent Joseph Ledo informed Plaintiff via email that the company would not move forward with Plaintiff's application.

### E.    Defendants Experian and TransUnion Disregarded Plaintiff's Second Dispute and Continued to Report the Discharged Student Loan as Past Due

#### 1.    In October 2025, Plaintiff Sent Her Second Dispute to Experian and TransUnion

77.    Plaintiff prepared a second dispute to Experian and TransUnion, which she signed prior to issuing ("Plaintiff's Second Dispute").  Plaintiff's Second Dispute was dated October 17, 2025, and was sent via certified mail to Experian and TransUnion through the United States Postal Service and delivered to both bureaus on October 21, 2025.

78.    Plaintiff's Second Dispute clearly identified the disputed tradeline furnished by Aidvantage and the Department of Education.  The relevant portion of Plaintiff's Second Dispute is reproduced in Figure 4 below:

*Figure 4:  Identification of Disputed Tradeline in Plaintiff's Second Dispute.*

Account in Dispute

DEPT OF ED/AIDVANTAGE, Account Number: 958856XXXXXXXXXXXXXXXXXX
Date opened: Sep 09, 2013
Account Type: Education
Responsibility: Individual
Status: Open. $898 past due as of Aug 2025
Balance: $11,751
Original Balance: $8,592
Past due amount: $898
April 2025: Past due 90 days
May 2025: Past due 120 days
June 2025: Past due 150 days
July 2025: Past due 180 days
August 2025: Past due 180 days

Plaintiff's Second Dispute further informed Experian and TransUnion that she "previously disputed this same inaccurate information in writing back on August 16, 2025" and noted that each bureau "failed to correct the disputed information/status of the disputed account."

79. Like Plaintiff's First Dispute, Plaintiff's second dispute explained the basis for her dispute. Specifically, Plaintiff provided the following information:

> I am disputing the accuracy of this tradeline on my credit report. On January 8, 2025, I received an email from the Department of Education ("ED") with the Subject: "Confirming your student loan discharge." The letter then goes on to state that a prior determination had been made that my federal student loans should be discharged based on misconduct by the school that I attended. It specifically states, "We previously notified you that the federal student loans you received to attend the Art Institutes during the period of January 1, 2004 through October 16, 2017 would be discharged because ED concluded that your school made pervasive and widespread and substantial misrepresentations which borrowers relied on to their detriment, and/or violated state consumer protection laws." Most importantly, the ED's correspondence states: "We are confirming that if your discharge is still incomplete **you do not have to make any more payment on the loan(s)** that we are in the process of discharging" We will discharge the **full remaining balance** of your eligible loans and refund all payments you previously made to ED on these loans.

80. As with Plaintiff's First Dispute, Plaintiff attached the Department of Education's January 8, 2025, email confirming that her federal student loans had been discharged as well as a photocopy of her current driver's license. Plaintiff also included the relevant portion of the September 29, 2025, credit reports generated by Experian and TransUnion, respectively.[3] Plaintiff's Second Dispute further requested that the disputed "account … be noted on my credit file as 'in dispute'" and asked for "the names, addresses and telephone numbers of individuals [Experian and TransUnion] contacted as part of [their] reinvestigation."

### 2. Aidvantage Belatedly Informed Plaintiff that Her Federal Student Loans Had Been Discharged

---

[3] 2025-10-17 Second Dispute to Experian; 2025-10-17 Second Dispute to TransUnion.

81.     By letter dated October 27, 2025, Aidvantage informed Plaintiff that "[t]he U.S. Department of Education recently determined that your loans to attend Arts Institute will be discharged." The relevant portion of Aidvantage's October 27, 2025, letter is reproduced in Figure 5 below:

**Figure 5:** *Aidvantage October 27, 2025, Letter Confirming Plaintiff's Student Loans were Discharged.*

Dear Toni,

The U.S. Department of Education (ED) recently determined that your loans to attend Arts Institute will be discharged.

**WHAT YOU NEED TO KNOW**

We discharged 100% of the loans listed below. As a result, these loans have no remaining balance to be paid.

**Note:** This discharge notice applies only to the loans identified below. Any payments made that are determined eligible for refund will either be reallocated to other outstanding loans, if applicable, or may be refunded to you once that determination is made. You may still have a remaining balance to be paid on other federal loans you borrowed to attend a different institution of higher education. This notice also does not affect any private loans you took out to pay for your (or your child's) education. You can review your federal student loan and servicer information on StudentAid.gov by logging in using your FSAID.

| Loan Program | Disbursement Date | Original Principal Balance |
|---|---|---|
| Stafford Subsidized | 08/07/2007 | $3,769.27 |
| Stafford Subsidized | 03/27/2008 | $4,823.46 |

82.     Contrary to Aidvantage's claim that this was a "recent[]" development, the Department of Education, as alleged above, had confirmed this same information on January 8, 2025—almost a year earlier. In providing this letter to Plaintiff, however, Aidvantage conceded that the information it had been reporting and verifying concerning the Discharged Student Loan had been false since at least January 8, 2025.

83.     Aidvantage further conceded that it had failed to conduct a reasonable investigation in response to Plaintiff's First Dispute when, as alleged above, it falsely verified the information it was reporting concerning the Discharged Student Loan as accurate. As alleged above, the Department of Education's January 8, 2025, email confirmed that Plaintiff's loan "servicer has been instructed that the loan(s) that is(are) the subject of this notice should not be put into

- 36 -

repayment."[4]  Thus, Aidvantage had been aware of the Department of Education's determination as of January 8, 2025.  Indeed, as alleged above, Plaintiff's other loan servicers had promptly updated their reporting to reflect the Department of Education's determination.

84.     Aidvantage's letter also informed Plaintiff that "[w]ithin 45 days of this notification, we will request credit reporting agencies to remove any credit status previously reported for the identified loans."  As alleged below, however, Defendants Experian and TransUnion nevertheless failed to correct Plaintiff's credit reports in response to Plaintiff's Second Dispute.

### 3.     Defendants Experian and TransUnion Failed to Correct their Reporting in Response to Plaintiff's Second Dispute

85.     According to the green slips provided by the United States Postal Service, both Experian and TransUnion received Plaintiff's Second Dispute on October 21, 2025—a mere six days before Aidvantage confirmed by mail that Plaintiff's student loans were discharged.  Experian and TransUnion, however, failed to respond to Plaintiff's Second Dispute—substantively or, in TransUnion's case, at all—within the thirty-day period prescribed by 15 U.S.C. § 1681i(a)(1)(A). Given Aidvantage's recent letter confirming the loans were discharged, Experian and TransUnion's failure to provide Plaintiff with a corrected copy of her consumer report indicates they failed to conduct a reasonable reinvestigation in response to Plaintiff's Second Dispute and that Aidvantage and the Department of Education failed to conduct a reasonable investigation in response to Plaintiff's Second Dispute.

---

[4] 2025-01-08 Department of Education Email re Discharge.

### a. Experian Failed to Provide the Results of its Purported Reinvestigation of Plaintiff's Second Dispute

86. On October 28, 2025, Experian sent Plaintiff an email informing her of the steps Experian purports to take to resolve a dispute, including asking that the furnisher "verify all information regarding the item [Plaintiff] disputed and report back within 30 days of the date that [Experian] received [Plaintiff's] request." At that time, it had only been seven days since Experian received Plaintiff's Second Dispute.

87. Confusingly, the next day Plaintiff became aware that Experian had purportedly generated correspondence concerning Plaintiff's Second Dispute, indicating that its claimed reinvestigation was complete and the results were available. When Plaintiff attempted to access those results, however, she was presented with a webpage stating that her "dispute results are not currently available online." The relevant portion of the Experian webpage is reproduced in Figure 6 below:

*Figure 6*: *Experian Webpage Stating Results of Plaintiff's Second Dispute Not Available Online.*



- 38 -

88.     Not only were the dispute results not available online but Experian failed to mail, e-mail, or otherwise provide Plaintiff with any results of its purported reinvestigation into Plaintiff's Second Dispute at all.  In doing so, Experian—at a minimum—violated 15 U.S.C. § 1681i(a), which required Experian to "provide written notice to [Plaintiff] of the results of a reinvestigation … not later than 5 business days after the completion of the reinvestigation."  15 U.S.C. § 1681i(a)(6)(A).

89.     Further, however, Experian's failure to provide the results of its purported reinvestigation of Plaintiff's Second Dispute demonstrates that it failed to conduct a reasonable reinvestigation in violation of 15 U.S.C. § 1681i(a)(1)(A).  Experian's lack of response to Plaintiff's Second Dispute and its failure to correct Plaintiff's credit report indicates that it failed to review or disregarded the attached January 8, 2025, email from the Department of Education— just as it did with Plaintiff's First Dispute.  For the same reasons, then, Experian's failure to correct Plaintiff's credit report in response to Plaintiff's Second Dispute demonstrates that it failed to conduct a reasonable reinvestigation.

90.     In again failing to remove the Discharged Student Loan from Plaintiff's credit report, Experian further violated 15 U.S.C. § 1681e(b).  As it did with Plaintiff's First Dispute, Experian failed to review or disregarded the Department of Education's January 8, 2025, email provided with Plaintiff's Second Dispute.  For the same reasons, then, Experian failed to follow reasonable procedures to assure the maximum possible accuracy of Plaintiff's credit report.

b.      **TransUnion Failed to Provide the Results of its Purported Reinvestigation or Otherwise Respond at All**

91.     Whereas Experian at least emailed Plaintiff on October 28, 2025 (albeit confusingly and falsely), TransUnion failed to respond to Plaintiff's Second Dispute at all.  In doing so, TransUnion—at a minimum—violated 15 U.S.C. § 1681i(a), which required TransUnion to

"provide written notice to [Plaintiff] of the results of a reinvestigation … not later than 5 business days after the completion of the reinvestigation."  15 U.S.C. § 1681i(a)(6)(A).

92.    Further, however, TransUnion's failure to provide the results of its purported reinvestigation of Plaintiff's Second Dispute demonstrates that it failed to conduct a reasonable reinvestigation in violation of 15 U.S.C. § 1681i(a)(1)(A).  TransUnion's lack of response to Plaintiff's Second Dispute and its failure to correct Plaintiff's credit report indicates that it failed to review or disregarded the attached January 8, 2025, email from the Department of Education— just as it did with Plaintiff's First Dispute.  For the same reasons, then, TransUnion's failure to correct Plaintiff's credit report in response to Plaintiff's Second Dispute demonstrates that it failed to conduct a reasonable reinvestigation.

93.    In again failing to remove the Discharged Student Loan from Plaintiff's credit report, TransUnion further violated 15 U.S.C. § 1681e(b).  As it did with Plaintiff's First Dispute, TransUnion failed to review or disregarded the Department of Education's January 8, 2025, email provided with Plaintiff's Second Dispute.  For the same reasons, then, TransUnion failed to follow reasonable procedures to assure the maximum possible accuracy of Plaintiff's credit report.

        **c.**      **Aidvantage and the Department of Education Failed to Conduct a Reasonable Investigation in Response to Plaintiff's Second Dispute**

94.    As alleged above, 15 U.S.C. § 1681i(a)(2)(A) required Defendants Experian and TransUnion to provide "all relevant information" concerning Plaintiff's Second Dispute to Aidvantage and the Department of Education.  Experian's October 28, 2025, email regarding Plaintiff's Second Dispute indicates that it did so.  Likewise, TransUnion's generic and boilerplate description of its purported reinvestigation provided in response to Plaintiff's First Dispute indicates that it forwarded "relevant information …, including any provided documents" to Aidvantage and the Department of Education upon receiving Plaintiff's Second Dispute as well.

Both Experian and TransUnion purport to take this action in order to obtain the furnishers' verification that the disputed information is being reported accurately.  Indeed, both Experian and TransUnion rejected Plaintiff's First Dispute upon Aidvantage and the Department of Education's verification that the disputed information was being reported correctly.  Thus, Experian and TransUnion's prior statements indicate that they forwarded Plaintiff's Second Dispute and the supporting documentation provided therewith to Aidvantage and the Department of Education.

95.     That neither Experian nor TransUnion provided Plaintiff with a corrected copy of her report in response to Plaintiff's Second Dispute indicates that Aidvantage and the Department of Education again verified that the current status of the Discharged Student Loan was being reported accurately.  In doing so, each furnisher inferably ignored the Department of Education's January 8, 2025, email, which was provided with Plaintiff's Second Dispute and confirmed that the obligation had been discharged, was unenforceable, and without legal basis.  Aidvantage, in particular, however, apparently disregarded its own October 27, 2025, letter to Plaintiff confirming the furnisher's understanding that Plaintiff's student loans had been discharged.  Thus, Aidvantage and the Department of Education failed to conduct a reasonable investigation in response to Plaintiff's Second Dispute in violation of 15 U.S.C. § 1681s-2(b).

**F.      Six Months After Plaintiff's First Dispute, Defendants Experian and TransUnion Finally Corrected her Credit Report**

**1.      In January 2026, Plaintiff Sent Her Third Dispute to Defendants Experian and TransUnion**

96.     Plaintiff prepared a third dispute to Defendants Experian and TransUnion, which she signed prior to issuing ("Plaintiff's Third Dispute").[5]  Plaintiff's Third Dispute was dated January 12, 2026, sent via certified mail to each of Defendants Experian and TransUnion through

---

[5] 2026-01-12 Third Dispute Packet to TransUnion; 2026-01-12 Third Dispute Packet to Experian.

the United States Postal Service, and delivered to Defendants Experian and TransUnion on January 20, 2026.

97.    Like Plaintiff's previous two disputes, Plaintiff's Third Dispute clearly identified the disputed tradeline furnished by Defendants Aidvantage and the Department of Education.  The relevant portion of Plaintiff's Third Dispute is reproduced in Figure 7 below:

*Figure 7:  Plaintiff's Third Dispute, Identification of Account in Dispute.*

Account in Dispute

DEPT OF ED/AIDVANTAGE, Account Number: 958856XXXXXXXXXXXXXXXXXX
Date opened: Sep 09, 2013
Account Type: Education
Responsibility: Individual
Status: Open. $898 past due as of Aug 2025
Balance: $11,751
Original Balance: $8,592
Past due amount: $898
April 2025: Past due 90 days
May 2025: Past due 120 days
June 2025: Past due 150 days
July 2025: Past due 180 days
August 2025: Past due 180 days

Plaintiff's Third Dispute further informed Defendants Experian and TransUnion of her prior two disputes, stating "I am writing, **now for a third time**, to dispute an account that needs to be corrected."  Plaintiff provided the following information concerning her previous two disputes to Experian:

> I previously disputed this same inaccurate information in writing back on August 16, 2025.  Experian responded to my first dispute on September 23, 2025, but failed to correct the disputed information/status of the disputed account.

> I then disputed this same inaccurate information in writing back on October 17, 2025.  Experian failed to respond to my October 2025 dispute.

Plaintiff's description of her previous two disputes provided to TransUnion was substantially similar while noting that TransUnion responded to Plaintiff's first dispute on September 3, 2025.

98. Like Plaintiff's previous two disputes, Plaintiff's Third Dispute explained the basis for her dispute. Specifically, Plaintiff provided the following information:

I am disputing the accuracy of this tradeline on my credit report.

On January 8, 2025, I received an email from the Department of Education ("ED") with the Subject: "Confirming your student loan discharge." The letter then goes on to state that a prior determination had been made that my federal student loans should be discharged based on misconduct by the school that I attended. It specifically states, "We previously notified you that the federal student loans you received to attend the Art Institutes during the period of January 1, 2004 through October 16, 2017 would be discharged because ED concluded that your school made pervasive and widespread and substantial misrepresentations which borrowers relied on to their detriment, and/or violated state consumer protection laws." Most importantly, the ED's correspondence states: "We are confirming that if your discharge is still incomplete **you do not have to make any more payment on the loan(s)** that we are in the process of discharging" We will discharge the **<u>full remaining balance</u>** of your eligible loans and refund all payments you previously made to ED on these loans.

99. As with Plaintiff's previous two disputes, Plaintiff attached the Department of Education's January 8, 2025, email confirming that her federal student loans had been discharged, as well as a photocopy of her current driver's license. Plaintiff also included the relevant portion of her credit reports from Defendants Experian and TransUnion, respectively. Plaintiff's Third Dispute further requested that the disputed "account … be noted on my credit file as 'in dispute'" and asked for "the names, addresses and telephone numbers of individuals [Experian and TransUnion] contacted as part of their reinvestigation."

      **2.    Defendants Experian and TransUnion Finally Provided Corrected Copies of Plaintiff's Credit Report Six Months After Plaintiff's First Dispute**

100. On February 25, 2026, Plaintiff accessed corrected copies of her credit reports from Experian, TransUnion, and Equifax. Equifax's report indicated that it had continued to accurately report the status of the Discharged Student Loan since the tradeline was apparently corrected in

response to Plaintiff's First Dispute.  Experian and TransUnion's reports each finally removed the Discharged student loan from Plaintiff's credit report.

101.    In issuing the correction, Defendants Experian and TransUnion effectively conceded that they had failed to follow reasonable procedures to assure the maximum possible accuracy of Plaintiff's credit report in violation of 15 U.S.C. § 1681e(b).  As alleged above, in its January 8, 2025, email discharging Plaintiff's federal student loans, the Department of Education confirmed that it would "[r]emove the loans from [Plaintiff's] credit report," indicating that the Department of Education would communicate its determination to Defendants Experian and TransUnion.  Subsequent events demonstrate that the Department of Education did just that.  As of September 3, 2025, almost every federal student loan Plaintiff obtained to attend the Miami International University of Art and Design was absent from Plaintiff's Experian credit report.  The only loan still present on Experian's September 3, 2025 report was the consolidated loan serviced by Aidvantage.  Thus, the Department of Education inferably communicated its determination to Defendants Experian and TransUnion—either itself or through its loan servicers.  Experian and TransUnion, however, failed to remove all of Plaintiff's discharged loans from her credit report. In doing so, Experian and TransUnion failed to follow reasonable procedures to assure the maximum possible accuracy of Plaintiff's credit report.

102.    Experian and TransUnion's belated correction of Plaintiff's credit report further conceded that they had each failed to conduct a reasonable reinvestigation in response to Plaintiff's numerous disputes in violation of 15 U.S.C. § 1681i(a)(1)(A).  Plaintiff's First Dispute was submitted to Experian and TransUnion over six months before the bureaus finally corrected her report.  As alleged above, she attached a copy of the Department of Education's January 8, 2025, email to that dispute.  That email confirmed that Plaintiff's loans to attend the Miami International

University of Art and Design were discharged, unenforceable, and without legal basis. In fact, it went so far as to inform Plaintiff that the Department of Education would "refund all payments [she] previously made to ED on these loans."

103. A cursory review of this email from the Department of Education would have confirmed to Defendants Experian and TransUnion, as it did for Equifax, that Plaintiff's student loans were discharged and should be removed from her credit report. Defendants' failure to correct Plaintiff's credit report in response to Plaintiff's First Dispute and apparently in response to Plaintiff's Second Dispute as well, thus, indicates that they failed to conduct a review of, or entirely disregarded, the documents Plaintiff submitted in support of her dispute. In doing so, Experian and TransUnion failed to conduct a reasonable reinvestigation in response to Plaintiff's First and Second Disputes.

104. To the extent Defendants Experian and TransUnion deferred to Aidvantage and the Department of Education's contradictory and false representations concerning the current status of the Discharged Student Loan, they failed to conduct a reasonable reinvestigation in response to Plaintiff's disputes. The Department of Education—the originator and funder of Plaintiff's student loans—determined that Plaintiff's student loans were discharged as of, at the latest, January 8, 2025. Aidvantage and the Department of Education's later purported verification that the Discharged Student Loan remained in repayment contradicted this earlier official communication from the Department of Education. At a minimum, this should have alerted Experian and TransUnion that further investigation was necessary to determine the true status of the Discharged Student Loan. Instead, Experian and TransUnion blindly parroted Aidvantage and the Department of Education's facially contradictory, inconsistent, and false representation that the Discharged

Student Loan remained in repayment.  In doing so, Experian and TransUnion failed to conduct a reasonable reinvestigation in response to Plaintiff's First and Second Disputes.

105.    Moreover, Experian and TransUnion cited no material change in circumstances justifying the abrupt reversal, effectively conceding that their previous purported reinvestigations in response to Plaintiff's First and Second Disputes were unreasonable.  Nor was there a material change in circumstances to cite.  The Department of Education's determination was finalized, at the latest, on January 8, 2025.  It was not changed, delayed, or belatedly implemented.  Indeed, as alleged above, Plaintiff's other student loans to attend the same institution were removed from her Experian credit report as of September 3, 2025.  Yet, Experian and TransUnion nevertheless failed to remove the Discharged Student Loan from Plaintiff's credit report for nearly a year after the Department of Education confirmed its determination—in spite of Plaintiff's numerous disputes and supporting documentation and contrary to Equifax's nearly immediate determination that Plaintiff's dispute was well-founded.  With no change in circumstances to justify Experian and TransUnion's reversal in response to Plaintiff's Third Dispute, Experian and TransUnion conceded that their purported reinvestigations up to that point—to the extent they were conducted at all— were unreasonable.

### III.    EXPERIAN AND TRANSUNION'S REINVESTIGATION PROCEDURES PERPETUATE ERRORS IN CONSUMER REPORTS

#### A.    Experian and TransUnion Receive Millions of Meritorious Consumer Disputes a Year

106.    As alleged above, the FCRA entitles consumers to dispute inaccurate information on their credit reports.  15 U.S.C. § 1681i(a)(1)(A).  Consumers are often best-positioned to identify inaccurate information in their consumer report given their in-depth knowledge of themselves, their histories, and the transactions they have engaged in.  The Consumer Financial Protection Bureau reports that consumers often detail this information to CRAs in consumer

disputes, which regularly take the form of a comprehensive letter identifying the inaccurate information and the basis for the consumer's belief that the information is inaccurate supported by relevant documentary evidence.  As alleged above, Plaintiff did exactly this in connection with each of her three disputes.

107.    Experian and TransUnion receive millions of similar consumer disputes each year. An annual report released by the Consumer Financial Protection Bureau in December 2025 found that the CFPB received more than 4.8 million consumer complaints about credit and consumer reporting between January 1, 2024, and June 30, 2025.  Of those complaints, approximately 3.9 million were about the three largest national CRAs, Experian, TransUnion, and Equifax. According to the Consumer Financial Protection Bureau, these numbers represented "an almost 3,000% increase in NCRA [defined in the report as Experian, TransUnion, and Equifax] complaints since January 1, 2020."  2020 was itself a record year.  In its annual report released in January 2022, the CFPB announced that it received over 700,000 credit or consumer reporting complaints about Experian, TransUnion, or Equifax from January 2020 to September 2021.

108.    Although the December 2025 report omits a breakdown of the complaints by category, earlier annual reports indicate that a substantial majority of consumer complaints submitted to the CFPB involved incorrect information on the consumer's report or an issue regarding the credit reporting company's investigation into an existing problem.  The CFPB's January 2022 annual report observed that "[o]f the more than 760,000 complaints transmitted by the CFPB to the NCRAs [*i.e.*, Experian, TransUnion, and Equifax] between 2018 and 2020, more than 83%"—or 630,800—involved these issues.  Similarly, the CFPB's January 2023 annual report observed that 65% of the 488,000 complaints—or 317,200—transmitted by the CFPB to Experian, TransUnion, and Equifax between October 2021 and September 2022 involved these issues.

**B.    Experian and TransUnion Utilize Flawed Procedures to Reinvestigate Consumer Disputes**

109.    As alleged above, when Defendants Experian and TransUnion receive a consumer's dispute, they have thirty days to "conduct a reasonable reinvestigation to determine whether the disputed information is inaccurate and record the current status of the disputed information, or delete the item from the file."  15 U.S.C. § 1681i(1)(A).  In the vast majority of cases, Experian and TransUnion purport to meet this obligation via the Automated Consumer Dispute Verification form ("ACDV").  When a consumer sends a dispute to Experian or TransUnion, their agents or employees purportedly review the material submitted by the consumer and—without regard for the volume of information submitted in connection with the dispute—select a two-to-three-digit code the employee believes best describes the consumer's issue.

110.    Experian and TransUnion's agents or employees then input this "dispute code" into an Automated Consumer Dispute Verification Form ("ACDV")—typically a single page—along with other identifying information about the consumer in Experian and TransUnion's files, such as name, address, social security number, and date of birth.  Once filled out, Experian and TransUnion forward the ACDV to the furnisher through the Online Solutions for Complete and Accurate Reporting system ("e-OSCAR").

111.    Once its review is complete, the furnisher returns the ACDV to Experian or TransUnion.  The furnisher inputs their own two-digit "response code," which communicates to the bureaus whether the information disputed by the consumer is accurate, needs changes, or should be deleted.  Typically, the ACDV is the only way Experian and TransUnion communicate with the furnishers of disputed information during a purported reinvestigation.

**C.** **Experian and TransUnion's Reinvestigation Procedure is Unreasonably Flawed**

112. Experian and TransUnion's "reinvestigation" procedure outlined above omits nearly all of the detail and supporting information provided by consumers in connection with their disputes by, among other things, (1) improperly stripping detailed consumer disputes down to a two-to-three-digit dispute code, (2) failing to provide sufficient detail beyond the dispute code, (3) failing to review or consider supporting documentation provided by the consumer in connection with the dispute, and (4) showing excessive deference to furnishers.

113. *First*, Experian and TransUnion improperly strip all consumer disputes—including the most detailed—down to one or two two-to-three-digit dispute codes. Their agent or employee has only twenty-six dispute codes with which to label a consumer's complaint. According to congressional testimony, of these twenty-six codes, Experian and TransUnion's agents or employees use the same five codes to characterize the vast majority of the millions of consumer disputes they receive. Figure 8 below reproduces the National Consumer Law Center's summary of congressional testimony regarding Experian, TransUnion, and Equifax's most frequently used dispute codes:

**[THIS SPACE INTENTIONALLY LEFT BLANK]**

***Figure 8:*** *Most Commonly Used Dispute Codes Reported by the National Consumer Law Center*

| | |
|---|---|
| Not his/hers | 30.5% |
| Disputes present/previous Account Status/History | 21.2% |
| Claims Inaccurate Information. Did not provide specific dispute | 16.8% |
| Disputes amounts | 8.8% |
| Claims account closed by consumer | 7.0% |
| Total | 84.3% |

114.  *Second*, Experian and TransUnion routinely fail to provide any information concerning a consumer's dispute in the ACDV beyond the dispute code. The ACDV includes a field in which Experian and TransUnion's employees or agents can add a narrative description of the consumer's complaint. The National Consumer Law Center reports, however, that this field is rarely used in practice. Thus, Experian and TransUnion routinely fail to include any information concerning a consumer's dispute in the ACDV beyond the dispute code.

115.  *Third*, Experian and TransUnion fail to review or consider supporting documentation provided by consumers in connection with their disputes. The CFPB's January 2022 annual report documented that not one of Experian, TransUnion, or Equifax forwarded supporting documentation provided by the consumer to furnishers until 2013. As the allegations above make clear, however, Experian, TransUnion, Aidvantage, and the Department of Education either failed to review Plaintiff's supporting documentation or disregarded it entirely.

116.  *Fourth*, Experian and TransUnion show excessive deference to furnishers even when their purported verifications of disputed information are facially contradictory. This is particularly clear from the bureaus' handling of Plaintiff's numerous disputes. Experian and TransUnion ignored Plaintiff's supporting documentation, including an email from the Department of Education—which originated and funded Plaintiff's loan. Instead, Experian and TransUnion meekly deferred to Aidvantage and the Department of Education's subsequent contradictory that the Discharged Student Loan remained in repayment. In doing so, Experian and TransUnion

disregarded Plaintiff's detailed and well-supported disputes, instead choosing to defer to Aidvantage and the Department of Education's facially contradictory verification of a disputed account the Department of Education itself confirmed had been discharged.

**D.      Defendants Experian and TransUnion Have Little Economic Incentive to Improve their Procedures**

117.    Those intimately affected by the CRAs' business practices, consumers are not the CRAs' primary customers.  Instead, the CRAs derive most of their revenue from furnishers—*i.e.*, those entities that provide or use the information contained in a consumer's credit report.

118.    Defendants Experian's and TransUnion's excessive deference to their primary customers, the furnishers, shape the procedures they implement to determine what information is included in a consumer report.  Explaining the nationwide CRAs' decision to match consumer data based on seven of nine digits of a consumer's SSN, Executive Director of the National Consumer Law Center testified that:

> The nationwide CRAs have chosen to be excessively and unreasonably over-inclusive because, as the FTC once noted:  "lenders may prefer to see all potentially derogatory information about a potential borrower, even if it cannot be matched to the borrower with certainty.  This preference could give the credit bureaus an incentive to design algorithms that are tolerant of mixed files."

In other words, Defendants Experian and TransUnion  prioritize the furnisher's preferences over those of consumers in designing their procedures—even where the resulting procedures violate the obligation to "follow reasonable procedures to assure maximum possible accuracy."  15 U.S.C. § 1681e(b).

119.    These misaligned incentives likewise shape how the Credit Bureau Defendants handle consumer disputes.  Consumers are virtually powerless to select among CRAs.  By contrast, furnishers—banks, creditors, employers, and loan originators—can choose the CRA with which they do business.  A reasonable investigation of a consumer dispute that results in the removal of

account information from a consumer's credit report alienates these furnishers by costing them the opportunity to collect debt and reap profits. Thus, CRAs like Defendants Experian and TransUnion are incentivized to reject consumer disputes to appease their primary customers with little to no countervailing incentives to accurately report the consumer's information.

120. More basically, however, reasonable procedures to assure maximum possible accuracy and reasonable investigations of consumer disputes incur great cost with little positive impact on Defendants Experian's and TransUnion's bottom lines. This principle is borne out in, for example, the CRAs' consumer-dispute infrastructure. Only Experian maintains centers to process consumer disputes within the United States, although it does process many consumer disputes in Chile. Defendant TransUnion, by contrast, outsources the function to India, Jamaica, the Philippines, or Costa Rica. The workers in these facilities, and in Experian's domestic and Chilean facility, are held to strict quotas for processing consumer disputes. Under Experian's quota, employees have been required to manage at least 98.25 disputes per day—approximately 13 per hour. Similarly, TransUnion has required its employees to process 10 to 14 disputes per hour.

IV.    **PLAINTIFF SUFFERED HARM AS A RESULT OF DEFENDANTS'
VIOLATIONS OF LAW**

121. Defendants' eventual correction of Plaintiff's credit report was too little, too late, as the publication of her credit report caused her to suffer lost wages, lost economic opportunities, reputational harm, and emotional distress.

122. *First*, as alleged above, Defendants' repeated failures to correct Plaintiff's credit reports resulted in her disqualification from employment with Throgs and State Farm. Plaintiff was eventually able to obtain employment with US Legal Support, American Retrieval in or about

October 2025.  However, in the interim, Plaintiff lost the opportunity of weeks of full-time, paid employment and the benefits that come with it.

123.    *Second*, Plaintiff suffered lost economic opportunities as a result of Defendants' failures to correct her credit reports.  As alleged above, Plaintiff lost the opportunity to obtain joint financing with her fiancé for the purchase of a family vehicle.  Plaintiff has further been seeking to finance the purchase of a home with her fiancé.  As a result of Defendants' false representations regarding Plaintiff's credit standing and creditworthiness, however, she has only been able to do so on less favorable terms than she would obtain had Defendants not violated their statutory obligations.

124.    *Third*, Plaintiff suffered reputational harm as a result of Defendants' false representations concerning Plaintiff's credit standing and creditworthiness.  As alleged above, Plaintiff has been denied credit or employment on numerous occasions as a result of Defendants' false representations concerning the Discharged Student Loan.  This included the purchase of a family vehicle with her fiancé, as well as being denied employment with Throgs and State Farm. The denial of Plaintiff's applications for each of these opportunities caused her humiliation and embarrassment, effectively communicating to prospective employers and her soon-to-be husband that she was financially irresponsible and unworthy of trust in the management of financial affairs. Indeed, as Throgs communicated to Plaintiff, the company checks employees credit history to "ensure[] that our future employee is credible, trustworthy, and can be an asset to the company." Defendants, however, falsely represented that Plaintiff was none of these things.

125.    *Fourth*, Plaintiff suffered emotional distress.  Specifically, Plaintiff suffered the stress, fear, and anxiety of believing that she would not be able to obtain employment.  Defendants' false representations concerning Plaintiff's credit standing and credit worthiness further caused

Plaintiff the stress, fear, and anxiety that she would not be able to obtain financing for significant milestones she hoped to achieve as she started a family with her soon-to-be husband, including purchasing a family vehicle and family home.  As a result, Plaintiff further suffered the stress, fear, and anxiety that her inability to obtain credit would disrupt her relationship at a significant juncture.  Defendants' blatant disregard for Plaintiff's numerous, meritorious, and well-supported disputes needlessly prolonged Plaintiff's emotional distress for nearly a year, thereby causing her to believe the issue would never be resolved.

## CLAIMS FOR RELIEF

### COUNT I
### 15 U.S.C. § 1681e(b)
### Failure to Follow Reasonable Procedures to Assure Maximum Possible Accuracy
### (First Claim for Relief Against Defendants Experian and TransUnion)

126.    Plaintiff repeats and re-alleges each and every allegation above as if set forth in full herein.

127.    Experian and TransUnion are each a "consumer reporting agency" as that term is defined in 15 U.S.C. § 1681a(f).

128.    At all relevant times, Plaintiff was a "consumer" as that term is defined in 15 U.S.C. § 1681a(c).

129.    The credit reports prepared by Experian and TransUnion were "consumer reports" as that term is defined in 15 U.S.C. § 1681a(d).

130.    Experian and TransUnion violated 15 U.S.C. § 1681e(b) by failing to "follow reasonable procedures to assure [the] maximum possible accuracy" of the contents of Plaintiff's credit reports, as well as the credit files Experian and TransUnion maintain and publish.

131.    As a result of Experian and TransUnion's violations of 15 U.S.C. § 1681e(b), Plaintiff has suffered a range of actual damages, including without limitation:

a) lost wages and significant economic opportunities, including the ability to obtain financing for the purchase of a family vehicle and home and/or the ability to obtain financing at favorable terms;

b) the loss of time and money disputing Experian and TransUnion's false representations concerning the Discharged Student Loan, Plaintiff's credit standing, and her creditworthiness;

c) Significant reputational harm; and

d) Significant and ongoing emotional distress, including, but not limited to, mental anguish, anxiety, stress, fear, frustration, humiliation, and embarrassment.

132.    Experian and TransUnion willfully violated 15 U.S.C. § 1681e(b) by, among other things alleged above and fully incorporated herein, pursuing a policy to intentionally, willfully, and/or recklessly defer to their furnishers' representations concerning a disputed tradeline even when, as in the case of Plaintiff, the furnishers' purported verifications are facially contradictory, inconsistent, and false.

133.    In the alternative, Experian and TransUnion negligently violated 15 U.S.C. § 1681e(b) by, among other things alleged above and fully incorporated herein, failing to review or entirely disregarding records in their possession, which if reviewed, would have quickly revealed that the status of the Discharged Student Loan was being falsely reported.

134.    Pursuant to 15 U.S.C. §§ 1681n and 1681o, Experian and TransUnion are each separately liable for actual, statutory, and punitive damages together with reasonable attorney's fees and costs incurred in the prosecution of this action.

**COUNT II**
**15 U.S.C. § 1681i**
**Failure to Perform a Reasonable Reinvestigation of Plaintiff's Disputes**
**(Second Claim for Relief Against Defendants Experian and TransUnion)**

135.   Plaintiff repeats and re-alleges each and every allegation above as if set forth in full herein.

136.   Experian and TransUnion are each a "consumer reporting agency" as that term is defined in 15 U.S.C. § 1681a(f).

137.   At all relevant times, Plaintiff was a "consumer" as that term is defined in 15 U.S.C. § 1681a(c).

138.   The credit reports prepared by Experian and TransUnion were "consumer reports" as that term is defined in 15 U.S.C. § 1681a(d).

139.   The FCRA mandates that Experian and TransUnion conduct a reasonable reinvestigation of the accuracy of information "[i]f the completeness or accuracy of any item of information contained in a consumer's file" is disputed by the consumer.  15 U.S.C. § 1681i(a)(1). The FCRA imposes a 30-day limit on the duration of any such reinvestigation.  *Id.*

140.   The FCRA provides that if Experian or TransUnion conducts a reinvestigation of disputed information and confirms that the information is in fact inaccurate or is unable to verify the accuracy of the disputed information, they are required to delete that item of information from the consumer's file.  15 U.S.C. § 1681i(a)(5)(A).

141.   Plaintiff submitted three disputes to Experian and TransUnion between August 2025 and January 2026.  Plaintiff's disputes requested that Experian and TransUnion delete the Discharged Student Loan from her credit reports based on the Department of Education's January 8, 2025, email confirming that the loan had been discharged, which Plaintiff attached to each of her three disputes.

142.    Either Experian and TransUnion conducted *no* reinvestigation of Plaintiff's disputes, or such reinvestigations were so shoddy and unreasonable as to allow patently false and highly damaging information to remain in Plaintiff's credit files and credit reports.  As alleged above, in connection with Experian and TransUnion's purported reinvestigations, they either failed to review Plaintiff's supporting documentation or disregarded it entirely.  This procedure in particular was unreasonable.

143.    Experian and TransUnion violated 15 U.S.C. § 1681i by failing to delete inaccurate information in Plaintiff's credit files and reports after they received multiple notices of such inaccuracies; by failing to conduct a lawful reinvestigation on numerous occasions of the disputed tradeline; and by failing to maintain reasonable procedures with which to filter and verify disputed information in Plaintiff's credit files and reports.

144.    As a result of Experian and TransUnion's violations of 15 U.S.C. § 1681i, Plaintiff has suffered a range of actual damages including, without limitation:

    a)  lost wages and significant economic opportunities, including the ability to obtain financing for the purchase of a family vehicle and home and/or the ability to obtain financing at favorable terms;

    b)  the loss of time and money disputing Experian and TransUnion's false representations concerning the Discharged Student Loan, Plaintiff's credit standing, and her creditworthiness;

    c)  Significant reputational harm; and

    d)  Significant and ongoing emotional distress, including, but not limited to, mental anguish, anxiety, stress, fear, frustration, humiliation, and embarrassment.

145.    Experian and TransUnion willfully violated 15 U.S.C. § 1681i by, among other things alleged above and fully incorporated herein, pursuing a policy to intentionally, willfully, and/or recklessly defer to their furnishers' representations concerning a disputed tradeline even when, as in the case of Plaintiff, the furnishers' purported verifications are facially contradictory, inconsistent, and false.

146.    In the alternative, Experian and TransUnion negligently violated 15 U.S.C. § 1681i by, among other things alleged above and fully incorporated herein, failing to review or entirely disregarding highly probative documents provided by Plaintiff in connection with her numerous disputes, which if reviewed, would have quickly revealed that the status of the Discharged Student Loan was being falsely reported.

147.    Pursuant to 15 U.S.C. §§ 1681n and 1681o, Experian and TransUnion are each separately liable for actual, statutory, and punitive damages together with reasonable attorney's fees and costs incurred in the prosecution of this action.

### COUNT III
### 15 U.S.C. § 1681s-2(b)
**Failure to Conduct a Reasonable Investigation of the Disputed Information and Review all Relevant Information Provided by Plaintiff**
**(First Claim for Relief Against Defendants Aidvantage and the Department of Education)**

148.    Plaintiff repeats and re-alleges each and every allegation above as if set forth in full herein.

149.    Aidvantage and the Department of Education published the inaccurate status of the Discharged Student Loan to Experian and TransUnion in spite of the Department of Education's determination that Plaintiff's student loans were unenforceable, without legal basis, and fully discharged.

150.    Aidvantage and the Department of Education violated 15 U.S.C. § 1681s-2(b) by failing to fully and properly investigate Plaintiff's numerous disputes of the Discharged Student

Loan; by failing to review or entirely disregarding all relevant information provided by Plaintiff in connection with her numerous disputes, including documentation provided in support of her disputes; by failing to accurately respond to the various ACDVs sent to it by Experian and TransUnion; by failing to correctly report results of an accurate investigation to the Experian and TransUnion; and by failing to permanently and lawfully correct their own internal records to prevent the re-reporting of the Discharged Student Loan to Experian and TransUnion.

151. As a result of Aidvantage and the Department of Education's violations of § 1681s-2(b), Plaintiff has suffered a range of actual damages, including without limitation:

a) lost wages and significant economic opportunities, including the ability to obtain financing for the purchase of a family vehicle and home and/or the ability to obtain financing at favorable terms;

b) the loss of time and money disputing Experian and TransUnion's false representations concerning the Discharged Student Loan, Plaintiff's credit standing, and her creditworthiness;

c) Significant reputational harm; and

d) Significant and ongoing emotional distress, including, but not limited to, mental anguish, anxiety, stress, fear, frustration, humiliation, and embarrassment.

152. Aidvantage and the Department of Education willfully violated 15 U.S.C. § 1681s-2(b) by, among other things alleged above and fully incorporated herein, pursuing a policy to intentionally, willfully, and/or recklessly reporting false information concerning the Discharged Student Loan in spite of the Department of Education's own determination, of which Aidvantage was also aware, that the Discharged Student Loan was unenforceable, without legal basis, and fully discharged.

153. In the alternative, Aidvantage and the Department of Education negligently violated 15 U.S.C. § 1681s-2(b) by, among other things alleged above and fully incorporated herein, failing to review or entirely disregarding highly probative documents provided by Plaintiff in connection with her numerous disputes, which if reviewed, would have quickly revealed that the status of the Discharged Student Loan was being falsely reported.

154. Pursuant to 15 U.S.C. §§ 1681n and 1681o, Aidvantage and the Department of Education are each separately liable for actual, statutory, and punitive damages together with reasonable attorney's fees and costs incurred in the prosecution of this action.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment and relief against Defendants as follows:

A. Determining that Defendants negligently violated their substantive obligations under the FCRA;

B. Determining that Defendants willfully violated their substantive obligations under the FCRA;

C. Awarding Plaintiff actual, statutory, and punitive damages; reasonable attorneys' fees; and costs pursuant to the FCRA; and

D. Granting such other and further equitable relief as this Court may deem just, proper, and equitable, including any extraordinary equitable relief as permitted by law or equity to attach, impound, or otherwise restrict Defendants' assets to assure Plaintiff has an effective remedy.

## DEMAND FOR JURY TRIAL

155. Plaintiff demands a trial by jury on all issues so triable.

Dated: June 29, 2026

*/s/ Mark B. DeSanto*
Mark B. DeSanto (FL Bar No. 107688)
**BERGER MONTAGUE PC**
1818 Market Street, Suite 3600
Philadelphia, PA 19103
Tel: (215) 875-3000
Fax: (215) 875-4604
Email: mdesanto@bergermontague.com

Hans W. Lodge, MN Bar No. 0397012*
Jacob Kalphat-Losego, SBN 358654
**BERGER MONTAGUE PC**
1229 Tyler Street NE, Suite 205
Minneapolis, MN 55413
Telephone: (612) 607-7794
Fax: (612) 584-4470
Email: hlodge@bergermontague.com
Email: jkalphatlosego@bergermontague.com
*\*Pro Hac Vice Forthcoming*

*ATTORNEYS FOR PLAINTIFF*